UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80908-CIV-HURLEY

CAPITAL GROWTH FINANCIAL LLC,
     plaintiff,

vs.

QUANTA SPECIALTY LINES INSURANCE CO.,
     defendant.
_____/

ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
& *SUA SPONTE* ENTERING PARTIAL JUDGMENT ON THE PLEADINGS
IN FAVOR OF INSURED ON DUTY TO DEFEND

The plaintiff investment firm, Capital Growth Financial LLC (Capital Growth), sues defendant Quanta Specialty Lines Insurance Co. (Quanta), seeking declaratory judgment that Quanta wrongfully failed to defend and indemnify it under a claims made errors and omissions professional liability policy against a series of investor claims involving allegations of unsuitable aggressive investments and churning practices attributed to two financial advisors associated with the insured's Nebraska City office. The case is now before the court on Quanta's motion for judgment on the pleadings. [DE# 10].

For reasons which follow, the court has determined to deny Quanta's motion. Further, the court has determined to *sua sponte* enter partial judgment on the pleadings against Quanta on the duty to defend issue, finding this to be a purely legal issue which the defendant had full and fair opportunity to develop in the context of the current proceedings. *See e.g. Artistic Entertainment, Inc. v City of Warner Robins,* 331 F.3d 1196 (11th Cir. 2003)(approving *sua sponte* grant of summary judgment in cases involving purely legal questions based on complete evidentiary records);

1

*Gospel Missions of America v City of Los Angeles*, 328 F.3d 548 (9th Cir. 2003).

### The Policy

For the period running August 9, 2005 through August 9, 2006, Capital Growth obtained a "claims made" Broker/Dealer and Registered Representative Professional Liability Policy from Quanta ("the Policy").

The Policy provides insured persons with coverage for loss arising out of "wrongful acts" committed in the rendition of professional services. The "insuring agreement" of the Policy provides in pertinent part:

> The Insurer shall pay, on behalf of an Insured, Damages which the Insured becomes legally obligated to pay because of a claim that is both made against the Insured and reported to the insurer in writing during the Policy period or Discovery Period, if applicable, for a Wrongful Act committed solely in the rendering or failing to render Professional Services for a Client, provided:
>
> 1. Such Wrongful Act occurred on or after the Retroactive Date; and
>
> 2. As of the inception date of this Policy... no Insured had knowledge or reasonable basis upon which to anticipate that the Wrongful Act or any Interrelated Wrongful Act could result in a Claim.

[Policy, ¶ 1.A.].

A "wrongful act," in turn, is defined as "a negligent act or omission, including a Personal Injury Act, committed by an Insured in the rendering of Professional Services." [Policy, ¶ 2.T ].

The Policy further defines "interrelated wrongful acts" as any "wrongful acts" that are:

> 1. similar, repeated or continuous; or
>
> 2. connected by reason of any common fact, circumstance, situation, transaction, casualty, events, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, event, decisions or policies.

[Policy, ¶ 2. L ].

Finally, for present purposes, the section of the Policy defining claim accrual dates provides:

**Single Claim/Interrelated Wrongful Acts**

All Claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts shall be considered a single Claim and each such single Claim shall be deemed to have been made on the earlier of the following:

A. When the earliest claim arising out of such Wrongful Act or Interrelated Wrongful Acts was first made; or

B. When notice was provided to the Insurer ...concerning a Wrongful Act giving rise such Claim.

[Policy, ¶ 6].

## Procedural History

On July 9, 2006, an arbitration entitled *Bernice M. Bonebrake TTE, et al. vs Capital Growth Financial LLC et* al. ("Bonebrake" arbitration) was filed against Capital Growth during the policy period of the claims made and reported professional liability which Quanta issued to Capital Growth. Quanta tendered and is currently providing a defense to Capital Growth in the *Bonebrake* arbitration.

The claimant in *Bonebrake* alleged that Capital Growth, through investment advisors Rebecca Engle and Brian Schuster, caused damage to the claimant's investment account by pursuing a continuous pattern of aggressive and risky investments, contrary to the claimant's previously disclosed conservative investment objectives, and by engaging in excessive trading for the purpose of generating fees and commissions for themselves ("churning").

Bonebrake contended that the investment advisors misrepresented the likely returns on these investments, and neglected to advise that the investments were risky and that return of the

3

principal was not guaranteed.  In her NASD arbitration claim against Capital Growth, Engle and Schuster, she charges violations of NASD rules and Nebraska securities laws; violation of federal securities laws; breach of fiduciary duty, unsuitability, negligence, negligent misrepresentation, negligent supervision, vicarious liability and unjust enrichment.

In June, 2007, approximately 10 months after the Quanta Policy expired, several other investors filed NASD arbitration claims against Capital Growth, Schuster and Engle ["subsequent arbitration actions"]:

> *Ruby Roos Trust v Capital Growth Financial et* al, filed March 15, 2007;
>
> *Dwayne Witt Revocable Trust v Capital Growth Financial et* al, filed May 18, 2007;
>
> *Luther Memorial Scholarship Fund v Capital Growth Financial* filed May 3, 2007;
>
> *Arvilla Lorraine Orton v Capital Growth Financial* filed May 11, 2007;
>
> *George Stukenholtz v Capital Growth Financial* filed May 11, 2007;

Although these claims involved additional or different investments from those involved in the Bonebrake arbitration (with the exception of a Royal Palm Capital Group investment common to all), as well as some unique allegations pertaining to the types of omissions and affirmative misrepresentations allegedly made to induce the investments, all share the common allegation that Engle and Schuster engaged in a pattern of churning and unsuitable, aggressive and risky investments for clients expressing conservative trading objectives.[1]  Further, all of these claims arise out of misconduct attributed to Engle and Schuster, and all assert the vicarious and direct liability of Capital Growth for the alleged misconduct of these two employees. Finally, all of the

---

[1] For example, in the subsequent arbitrations, claimants allege that the advisors made investments in entities related to Capital Growth without disclosing the relationship or conflict of interest .

4

subsequent arbitrations  allege nearly identical causes of action as those asserted in Bonebrake -
violations of NASD rules; violations of federal and Nebraska securities laws; breach of fiduciary
duty; negligence; negligent misrepresentation; negligent supervision; *respondeat superior* and in
most cases, unjust enrichment.

Capital Growth  notified Quanta of the subsequent arbitrations and demanded  a defense and
indemnity, contending that all of  the subsequent  arbitrations  are properly treated as a "single
claim" as that concept is defined in the  Policy for purposes of determining the claim accrual date.
Quanta refused, prompting Capital Growth to file this  declaratory judgment action.

By its current motion for judgment on the pleadings, Quanta seeks entry of declaratory
judgment negating the existence of either a duty to  defend or indemnify, contending that the
subsequent arbitrations are not entitled to coverage because they are not   "interrelated" with the
Bonebrake claim and  therefore  do  not  fall  under the definition of a "single claim" which accrued
during  the Policy period.

### Standard of Review

A judgment on the pleadings is appropriate where there are no material facts in dispute, and
judgment may be rendered by considering the substance of the pleadings and any judicially noticed
facts. *Hawthorne v MAC Adjustment, Inc.*, 140 F.3d 1367 (11th Cir. 1998).   In resolving such a
motion, the district court applies the same standard as that applicable to a motion to dismiss under
Fed. R. Civ. P. 12(b)(6).

Hence, the court is confined to a review of the allegations pled in the complaint, accepting
those allegations as true, and must resolve any factual issues in a manner favorable to the non-
movant.  Judgment is then appropriate only where the moving party clearly establishes that no

material issue of fact remains unresolved and that it is entitled to judgment as a matter of law. *Bryan Ashley International Inc. v Shelly Williams Industries, Inc.*, 932 F. Supp. 290 (S.D. Fla. 1996).

### Precepts of Policy Interpretation

The Policy contains a choice of law provision stating that New York law governs all issues pertaining to the meaning, interpretation and effect of the Policy. [Policy, ¶ 23].

Under New York law, an insurance policy, like any contract, is construed to effectuate the intent of the parties as derived from the plain meaning of the policy terms. If the language is unambiguous, the court construes it based on the plain language of the policy. If the terms are ambiguous, i.e. reasonably susceptible to more than one interpretation, the court may consider extrinsic evidence to ascertain the meaning of the policy terms intended by the parties during the formation of the contract. *Morgan Stanley Group Inc v New England Ins. Co*, 225 F.3d 270, 275-76 (2d Cir. 2000). *Andy Warhol Foundation for the Visual Arts, Inc. v Federal Ins. Co.,* 189 F.3d 208, 215 (2d Cir. 1999). If the ambiguities cannot be resolved by examining the parties' intentions, then, under New York law, the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract. *Id.*

Further, ambiguities are ordinarily construed in favor of coverage and against the insurer because, as drafter of the policy, the insurer is deemed responsible for the ambiguity. And, even were a contract is ambiguous, summary judgment may nonetheless be appropriate were a court is in position to resolve the ambiguities through a legal rather than factual construction of its terms. *Id.*

## **Interrelation of Bonebrake and Subsequent Arbitrations**

In this case, the insured  asserts that the Bonebrake claim is  a prior claim that is logically "interrelated" by a common "factual nexus" with the wrongful acts alleged in each of the subsequent arbitrations.  Accordingly, it contends that  these claims should all be treated a  "single claim" under the Policy definition of that term, resulting in an accrual date which falls within the Policy period.

Quanta denies the existence of a common "factual nexus" between the Bonebrake claim and the subsequent arbitrations,  and denies that  the wrongful acts underlying these claims are "interrelated" within the meaning of the Policy, contending:  (1) the investments share some overlap, but are not identical; (2) the claimants are unrelated; (3) the claimants each had their own financial means and investment objectives; (4) the claimants each made their investment decisions at different times as a result of separate advice and according to their own financial positions.

Cases interpreting  comparable policy language have produced widely varying  results according to the circumstances of each case.  *See e.g. Financial Management Advisors, LLC v American International Specialty Lines Ins. Co.,* 506 F.3d 922 (9th Cir. 2007)*;  Continental Cas. Co v Wendt,* 205 F.3d 1258 (11th Cir.  2000); *Gateway Group Advantage Inc. v McCarthy*, 300 F. Supp. 2d 236 (D. Mass. 2003); *Lehigh Valley Health Network v Executive Risk Index. Inc.* 2001 WL 21505 (E.D. Pa. 2001); *Sigma Financial Corp. v American International Specialty Lines Ins. Co.*, 200 F. Supp. 2d 697 (E. D. Mich. 2001); *Zahler v Twin City Fire Ins. Co,* 2006 WL 846352 (S. D. N. Y. 2006); *Zunenshine v Executive Risk  Indemnity, Inc.,*  1998 WL 483475 (S.D. N.Y. 1998).

However, a common thread running here  views "relatedness" as a concept  encompassing both logical and causal connections,  *Continental Cas. Co v Wendt*, 205 F.3d 1258 (11th Cir.  2000), an assessment which typically  involves  consideration of  whether the acts in question  are connected

7

by time, place, opportunity, pattern, and perhaps most importantly, by method or modus operandi. *See e.g. Brown v National Union Ins. Co of Pittsburgh, Pa.* 2004 WL 292158 (D. Minn. 2004). Hence, courts analyzing the "relatedness" of claims in situations involving similar policy language consider, among other factors, whether the parties are the same, whether the claims all arise from the same transactions, whether the 'wrongful acts" are contemporaneous, and whether there is a common scheme or plan underlying the acts.

This approach does not require exact factual overlap, or even identical legal causes of action, but rather focuses simply on whether the claims are logically linked by a "sufficient factual nexus." *See e.g. Zahler v Twin City Fire Insurance Co,* 2006 WL 846352 (S. D. N. Y. 2006)(finding interrelation even where underlying claims were substantively distinct - securities fraud and breach of fiduciary duty ); *Zunenshine v Executive Risk Indemnity, Inc.* 1998 WL 483475 (S. D. N. Y. 1998), *aff'd* 182 F.3d 902 (2d Cir. 1999)(finding interrelation between negligent misrepresentation and securities fraud claims involving distinct communication mediums-  private and public disclosures).

In this case, the allegations contained in the subsequent arbitrations do show  the alleged wrongful acts of Engle and Schuster to be related in time, place, opportunity and pattern to those alleged in Bonebrake.  All of the unauthorized trading activity at issue in  Bonebrake and the subsequent arbitrations occurred  during  the four year span of time that Engle and Schuster worked together out of the insured's Nebraska City office, all  claims involved allegations of "unsuitable," aggressive and risky investments  pursued  in contravention of  the client's expressed conservative investment  objectives,  and all involved allegations of excessive trading, or self-dealing through "churning."    Although these two sets of arbitrations  do show some  variation in the types of

misrepresentations allegedly made to induce the investments, this variation is not sufficient, on its face, to preclude a finding of "interrelation" as a matter of law. Nor is the unique financial position of each investor - a factor driving the suitability question – sufficient to show as a matter of law that the subsequent arbitrations could not be "interrelated" with the Bonebrake arbitration under any possible scenario. Wrongful acts may be "interrelated" even where they do not uniformly translate into a common liability thread.

Accordingly, because Quanta fails to show there is no possible factual or legal basis on which the wrongful acts underlying the Bonebrake and subsequent arbitrations might be "interrelated" as a matter of law, its motion for judgment on the pleadings is necessarily denied.

### Duty to Defend

At oral argument upon Quanta's motion, both parties recognized and conceded that the duty to defend is a purely legal issue properly determined by laying the allegations of the arbitration claims against the Policy terms. The court agrees that this is a legal issue properly reserved for the court, and, finding it to be one which Quanta has had full and fair opportunity to develop during the course of the instant proceedings, now turns to a *sua sponte* determination on this limited issue.

Under New York law, an insurance company's duty to defend arises "whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim." *Frontier Insulation Contractors, Inc., v Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 175, 667 N.Y.S.2d 982 (1997); *Fitzpatrick v American Honda Motor Co.*, 78 N.Y. 2d 61, 65, 571 N.Y.S.2d 672 (1991); *Global Construction Co LLC v Essex Ins. Co.*, ___ N.Y.S.2d ____, 2008 WL 2456545 (N.Y.A.D. 2 Dept. 2008).

9

In order to determine whether an insurer has a duty to defend in a particular case, the court must match the allegations of the complaint against the terms of the insurance policy. If the allegations in the complaint "suggest ... a reasonable possibility of coverage," the insurer must defend no matter how groundless, false or baseless the underlying allegations may be. *Town of Massena v Healthcare Underwriters Mutual Ins. Co.*, 40 A.D. 3d 1177, 834 N. Y. S. 2d 736 (N.Y.A.D. 3 Dept. 2007). In this comparative analysis, the court must construe liberally in favor of coverage the facts alleged in the complaints in order to avoid having the duty to defend being controlled by inartful drafting by the underlying claimants. *Ruder & Finn Inc. v Seaboard Sur. Co.,* 52 N.Y.2d 663, 670, 439 N.Y.S.2d 858 (N.Y.1981), recognizing that the duty to defend is "exceedingly broad," broader than the duty to indemnify. *Continental Cas. Co. v Rapid -American Corp,* 80 N.Y.2d 640, 648, 593 N.Y.S.2d 966 (N.Y. 1993).

If this comparison yields no possible factual or legal basis upon which the insurer might eventually be held to be obligated to indemnity the claimant under any provision of the insurance policy, there is no duty to defend. *See also Burkhart, Wexler & Hirschberg, LLP v Liberty Ins. Underwriters,* 859 N.Y.S.2d 9901, 2008 WL 866644 (NY. Sup. Mar. 14, 2008).

Thus, in order to trigger Quanta's duty to defend in this case, the injuries alleged in the subsequent arbitrations must arise from "wrongful acts" which are "interrelated" with the wrongful acts alleged in the Bonebrake arbitration. There is no dispute that the unsuitability and churning claims in the subsequent arbitrations allege "wrongful acts" within the meaning of the Policy insuring agreement. Thus, the sole question in determining the duty to defend the subsequent arbitrations is whether the allegations of these claims facially demonstrate a sufficient factual nexus with the Bonebrake arbitration to trigger an "interrelation" between them.

Having carefully compared the allegations of the subsequent arbitrations with the Bonebrake arbitration, the court finds it is possible for the claims to be interrelated for purposes of triggering a duty to defend, notwithstanding the variances demonstrated by Quanta.     While Quanta demonstrates that the misrepresentations underlying the Bonebrake and subsequent arbitrations are not completely uniform and that an individual assessment of the investors' unique factual circumstances may be required to determine the insured's ultimate liability on the suitability claims, the insured demonstrates that the "wrongful acts" of churning and unsuitability alleged in the subsequent arbitrations share a common factual predicate in time, place (Nebraska City office), perpetrator (Schuster and Engle), and victim (conservative investor). Therefore, it could be found that the wrongful acts alleged in the subsequent arbitrations are "interrelated" with the wrongful acts alleged in Bonebrake, allowing both sets of claims to be treated as a "single claim" within the meaning of the Policy claim accrual date. The court accordingly finds that Quanta owed its insured a duty to defend against these claims.

On the other hand, variations in the methodology of abusive trading practices and types of misrepresentations allegedly employed by Schuster and Engle to induce the investments may be relevant to whether the subsequent arbitrations are "interrelated" with Bonebrake for purposes of triggering coverage as a "single claim" falling within the Policy period. Until the record is fully developed regarding the different types of activities and wrongdoing allegedly engaged in by Schuster and Engle with regard to the Capital Growth investors at issue, a genuine issue of material fact remains as to whether the wrongful acts allegedly committed by Schuster and Engle in the subsequent arbitrations are "interrelated" with those alleged in the Bonebrake for purposes of constituting a "single claim" covered by the Policy.

It is accordingly **ORDERED AND ADJUDGED**:

1. The defendant's motion for judgment on the pleadings [DE# 10] is **DENIED.**

2. The court *sua sponte* grants partial declaratory judgment on the pleadings in favor of the insured on the duty to defend issue.

3. It is accordingly adjudged and declared that Quanta has a duty to defend Capital Growth in the subsequent arbitrations and that Quanta breached the Policy by failing to provide that defense.

3. Quanta is ordered to defend its insured in the subsequent arbitrations, and to reimburse it for all reasonable costs and legal fees incurred in the defense of those claims. Any issue which arises with respect to the amount of reasonable costs and legal fees expended by the insured in defense of those actions shall be referred to the Magistrate Judge to hear and report with recommendations.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this ___29___ day of July, 2008.

Daniel T.K Hurley
United States District Judge

cc all counsel

12